STATE OF NORTH CAROLINA v. RONALD EUGENE PIERCE

No. 475A96

(Filed 24 July 1997)

## 1. Indigent Persons § 19 (NCI4th)— child abuse and murder—funds for defense psychiatrist—denied—no error

The trial court did not abuse its discretion in a capital prosecution for murder by torture, felony murder, and felonious child abuse which resulted in a life sentence by denying defendant's motion for funds for a psychiatrist. Indigent defendants are entitled to psychiatric experts upon a threshold showing that sanity is likely to be a significant factor in their defense. Defendant testified that he was twenty-two years old; that he had been placed in a program for the socially and emotionally disturbed in the seventh grade and remained in this program until the tenth grade; that he saw a psychiatrist during those years and had trouble with juvenile court which involved assaults and drinking; that his psychologist had told him that he had an anger control problem; that he had been placed in a juvenile facility where he had been required to see a psychologist; he was diagnosed at Dorothea Dix as suffering from polysubstance dependence and a personality disorder; the report from Dix stated that defendant did not suffer from "a severe mental disease or defect which would prevent him from understanding the difference between right and wrong at the time of the alleged offense"; he was cooperative, his thought processes were logical, he did not appear to be delusional, and his intellectual functioning appeared to be "fair to impaired"; he reported occasional hallucinations and suicidal thoughts during his stay at the hospital; he was on psychotropic medications; and it was recommended that he continue to receive those medications while awaiting trial. The evidence presented by this defendant does not approach the showing found sufficient in *Ake v. Oklahoma*, 470 U.S. 68, or *State v. Gambrell*, 318 N.C. 249.

**Am Jur 2d, Criminal Law §§ 771, 985, 1006.**

## 2. Indigent Persons § 21 (NCI4th)— child abuse and murder—funds for defense pathologist—denied

There was no abuse of discretion in a prosecution for murder by torture, felony murder, and felonious child abuse in the denial of defendant's motion for funds to retain a pathologist where

defendant's pretrial statements that the victim had been attacked by the family dog and assaulted by other children in the neighborhood and that she bruised easily were overwhelmingly refuted by the evidence presented by the State. Defendant presented nothing more than an undeveloped assertion that the assistance of a pathologist would be beneficial to the preparation of his defense.

**Am Jur 2d, Criminal Law §§ 771, 985, 1006.**

**3. Indigent Persons § 21 (NCI4th)— child abuse and murder—funds for child abuse expert—denied**

There was no abuse of discretion in a prosecution for murder by torture, felony murder, and felonious child abuse where the trial court denied defendant's request for funds for a medical expert in child abuse, determining that defendant had failed to make a particularized showing that he would be deprived of a fair trial without the assistance of a medical expert. All of the evidence suggested that the victim's injuries had been incurred as the result of child abuse and defendant did not present the court with anything other than speculation that an expert witness might testify that the victim had not been the victim of child abuse.

**Am Jur 2d, Criminal Law §§ 771, 985, 1006.**

**4. Evidence and Witnesses § 1268 (NCI4th)— child abuse and murder—defendant's statement—prior reading of rights**

The trial court did not err in a prosecution for murder by torture, felony murder, and felonious child abuse by denying defendant's motion to suppress his statement to an SBI agent where defendant had twice been advised of his rights and the agent did not readvise him. A detective and another SBI agent who had spoken with defendant earlier had fully and properly advised defendant of his rights and defendant waived his rights before giving statements to them; defendant was advised of his rights the second time five hours before this statement was taken; all three officers interviewed defendant with respect to the same subject matter; all three testified that defendant understood what they were saying and that he appeared to be alert and not under the influence of any substance; and nothing suggests that anything occurred to dilute the efficacy of the prior warnings or that defendant forgot his rights.

Am Jur 2d, Criminal Law §§ 794, 797, 974; Evidence § 749; Homicide § 338.

What constitutes assertions of right to counsel following Miranda warnings. 80 ALR Fed. 622.

5. **Evidence and Witnesses § 1694 (NCI4th)— child abuse and murder—photos of victim admissible**

There was no abuse of discretion in a prosecution for murder by torture, felonious child abuse, and felony murder in the admission of 26 photographs of the victim given the number, nature, and extent of the victim's injuries where each photograph illustrated testimony presented by the State and the testimony relating to the victim's injuries was unquestionably relevant.

Am Jur 2d, Evidence §§ 327, 963, 970; Homicide §§ 417-419; Trial § 507.

Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.

6. **Evidence and Witnesses § 1679 (NCI4th)— child abuse and murder—photo of defendant—appearance on day of arrest—admissible**

There was no error in a prosecution for murder by torture, felonious child abuse, and felony murder in the introduction of a photograph of defendant taken on the day of his arrest which shows tattoos and long hair. The photograph was not inflammatory and, even assuming error, there was no reasonable possibility of a different result had the photograph been excluded.

Am Jur 2d, Evidence §§ 630, 963, 973; Trial § 507.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

7. **Criminal Law § 535 (NCI4th Rev.)— child abuse and murder—defendant's statement—copy provided to jury—detective's collateral notation—mistrial denied**

There was no abuse of discretion in a prosecution for murder by torture, felonious child abuse, and felony murder in not declar-

ing a mistrial where copies of defendant's pretrial statement containing a detective's collateral notation that there were no bruises on defendant's girlfriend's child were provided to the jury. The prosecutor discovered the notation, brought it to the attention of the court, the copies were retrieved, a *voir dire* revealed that three jurors had seen the notation, the court denied defendant's motion for a mistrial, and the court instructed the jury to disregard the content of the page containing the notation. Evidence at trial showed that the girlfriend abused the victim and any suggestion that she did not abuse her children is unlikely to have prejudiced defendant. The court's instruction was sufficient to cure any prejudice which defendant may have suffered.

**Am Jur 2d, Appellate Review §§ 716, 724, 753; Criminal Law § 974.**

**8. Evidence and Witnesses §§ 351, 337 (NCI4th)— child abuse and murder—mistreatment of another child—relevant**

The trial court did not err in a prosecution for murder by torture, felonious child abuse, and felony murder by admitting testimony concerning defendant's alleged mistreatment of one his girlfriend's children. The testimony was relevant under N.C.G.S. § 8C-1, Rule 404(b) to establish defendant's motive and intent and to show the absence of mistake in that his conduct was sufficiently similar to contradict his suggestion that the injuries to this victim were inflicted while attempting to revive her. Even assuming the testimony was not admissible under N.C.G.S. § 8C-1, Rule 404(b), there was no prejudice from its admission because the State presented overwhelming evidence that defendant and his girlfriend abused this victim over a three or four week period and that defendant and his girlfriend inflicted numerous injuries on the victim during this period of time. There is no reasonable possibility that a different result would have been reached had the evidence been excluded. The fact that the trial court conducted a *voir dire* suggests that it carefully weighed the probative value of the evidence against the danger of unfair prejudice to defendant and the court gave an appropriate limiting instruction.

**Am Jur 2d, Evidence §§ 381, 408, 421.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other**

violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

9. **Homicide § 261.1 (NCI4th)— murder by torture—sufficiency of evidence**

The evidence was sufficient to support the submission of first-degree murder by torture to the jury where, viewed in the light most favorable to the State, it tended to show that defendant and his girlfriend punished the two-and-a-half-year-old victim by shaking her with their hands and by beating her with their fists, a belt, a metal tray, a broken antenna, and a pair of tennis shoes; the girlfriend in defendant's presence punished the victim by making her hang from a dresser by her forearms and chin; both the girlfriend and defendant punished the victim by making her wear soiled pants on her head; and defendant admitted smacking the victim ten times in the three weeks prior to her death, slapping her on the night she was taken to the hospital, and shaking her very hard on that night. The evidence permitted the jury to conclude that defendant engaged in a course of conduct in which he intentionally inflicted grievous pain and suffering upon the victim, that he did this to punish her, and that the torture was a proximate cause of her death.

**Am Jur 2d, Criminal Law § 598; Homicide §§ 48, 534, 544.**

**Inference of malice or intent to kill where killing is by blow without weapon. 22 ALR2d 854.**

**What constitutes murder by torture. 83 ALR3d 1222.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

10. **Infants or Minors § 20 (NCI4th)— felonious child abuse— evidence sufficient**

The trial court properly denied defendant's motion to dismiss a charge of felonious child abuse where the State's evidence tended to show that defendant was the victim's uncle, that he and his girlfriend had custody of the victim for three or four weeks prior to her death, that the victim was two and one-half years of

age at the time of her death, and that defendant intentionally committed an assault upon the victim resulting in her death.

**Am Jur 2d, Homicide § 85; Infants § 16.**

**Inference of malice or intent to kill where killing is by blow without weapon. 22 ALR2d 854.**

**Criminal liability of parent, teacher, or one in loco parentis for homicide by excessive or improper punishment inflicted on child. 89 ALR2d 417.**

**11. Homicide § 263 (NCI4th)— felony murder—based on felonious child abuse—evidence sufficient**

The trial court did not err by denying defendant's motion to dismiss a charge of felony murder based on felonious child abuse where the evidence that defendant caused a small child's death by shaking her with his hands was sufficient for the jury to conclude that defendant committed felonious child abuse and that he used his hands as deadly weapons.

**Am Jur 2d, Homicide §§ 47, 72, 265, 574.**

**Inference of malice or intent to kill where killing is by blow without weapon. 22 ALR2d 854.**

**Parts of the human body, other than feet, as deadly or dangerous weapons for purposes of statutes aggravating offenses such as assault and robbery. 8 ALR4th 1268.**

**12. Criminal Law § 806 (NCI4th Rev.)— acting in concert— instructions—general intent crimes— no plain error**

There was no plain error in a prosecution for murder by torture, felonious child abuse, and felony murder in the trial court's acting in concert instruction or reinstruction. Although defendant argued that the instruction permitted the jury to convict him without determining that he possessed the requisite specific intent to commit these crimes, none of these crimes requires specific intent. Moreover, defendant's argument is without merit under the statement of acting in concert adopted in *State v. Barnes*, 345 N.C. 184.

**Am Jur 2d, Criminal Law § 167; Homicide §§ 29, 72, 445, 507; Trial § 1256.**

**What constitutes murder by torture. 83 ALR3d 1222.**

STATE v. PIERCE

[346 N.C. 471 (1997)]

**13. Criminal Law § 805 (NCI4th Rev.)— child abuse and murder—acting in concert—evidence sufficient**

The trial court did not err by giving acting in concert instructions with respect to first-degree murder by torture, felony murder, and felonious child abuse where the evidence, viewed in the light most favorable to the State, tended to show that defendant and his girlfriend physically abused the two-and-one-half-year-old victim for three weeks prior to her death; she had been beaten with a belt, a broken antenna, a metal tray, a pair of tennis shoes, and fists; the girlfriend in defendant's presence punished the victim by making her hang by her forearms and chin from a dresser; both the girlfriend and defendant punished the victim by making her wear soiled pants on her head; and both defendant and the girlfriend struck and shook the child on the night that they took her to the hospital. The evidence was more than ample to show that defendant and his girlfriend acted together with the joint purpose to commit acts constituting felonious child abuse and torture and that the victim's death was a natural and probable consequence of their actions.

**Am Jur 2d, Criminal Law § 167; Homicide §§ 29, 72, 445, 507; Trial § 1256.**

**What constitutes murder by torture. 83 ALR3d 1222.**

**14. Criminal Law § 467 (NCI4th Rev.)— child abuse and murder—prosecutor's argument—bruises on victim—no plain error**

There was no plain error in a prosecution for first-degree murder by torture, felony murder, and felonious child abuse where the trial court did not intervene *ex mero motu* in the prosecutor's argument where the prosecutor showed the jury a pair of tennis shoes and argued that, while he couldn't say it was these shoes, the two-and-a-half-year-old victim had been hit or kicked with a shoe. A pathologist testified that the pattern bruise was consistent with the pattern on the soles of the shoes, although he also said that he could not definitely say that a shoe caused the injury or be certain that the shoes seized from defendant's home caused any injuries to the victim. The prosecutor's comments were a reasonable inference from the evidence.

**Am Jur 2d, Expert and Opinion Evidence §§ 244, 261; Homicide § 442.**

STATE v. PIERCE

[346 N.C. 471 (1997)]

Necessity and effect, in homicide prosecution, of expert medical testimony as to cause of death. 65 ALR3d 283.

What constitutes imminently dangerous act within homicide statute. 67 ALR3d 900.

What constitutes murder by torture. 83 ALR3d 1222.

15. Criminal Law § 471 (NCI4th Rev.)— child abuse and murder—prosecutor's argument—victim shaken and thrown

The trial court did not err in a prosecution for first-degree murder by torture, felony murder, and felonious child abuse by not intervening *ex mero motu* in the prosecutor's argument that the two-and-a-half-year-old victim was shaken and thrown and that the back of her head hit a wall where the pathologist testified that a crack in the drywall at defendant's house was similar in appearance to an abrasion or scrape on the back of the victim's head, the State's evidence tended to show that the victim suffered severe head injuries, and the cause of death was brain injuries. This supports the inference that defendant threw the victim and that the back of her head hit the wall.

Am Jur 2d, Expert and Opinion Evidence §§ 244, 261; Homicide § 442.

Necessity and effect, in homicide prosecution, of expert medical testimony as to cause of death. 65 ALR3d 283.

What constitutes imminently dangerous act within homicide statute. 67 ALR3d 900.

What constitutes murder by torture. 83 ALR3d 1222.

16. Criminal Law § 475 (NCI4th Rev.)— child abuse and murder—prosecutor's argument—lapsus linguae

The trial court did not abuse its discretion by not intervening *ex mero motu* in a prosecution for first-degree murder by torture, felony murder, and felonious child abuse in the prosecutor's argument where the prosecutor misstated the evidence, but the misstatement was a *lapsus linguae* and there was no reasonable possibility of a different outcome had the trial court taken corrective action.

Am Jur 2d, Homicide § 463; Trial §§ 499, 611.

STATE v. PIERCE

[346 N.C. 471 (1997)]

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Allen (C. Walter), J., at the 16 October 1995 Special Session of Superior Court, Wilkes County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment for felonious child abuse was allowed on 15 November 1996. Heard in the Supreme Court 14 April 1997.

*Michael F. Easley, Attorney General, by Jill Ledford Cheek, Assistant Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

PARKER, Justice.

Defendant was indicted 30 January 1995 for first-degree murder and felonious child abuse. In October 1995 he was tried capitally and found guilty of first-degree murder on the basis of torture and under the felony murder rule. He was also found guilty of felonious child abuse. Following a capital sentencing proceeding, the jury recommended a sentence of life imprisonment; and the trial court entered judgment accordingly. The trial court also sentenced defendant to ten years' imprisonment for felonious child abuse. For the reasons stated herein, we conclude that defendant's trial was free from prejudicial error.

The victim, Tabitha Pierce, was two and one-half years old at the time of her death. Defendant Ronald Pierce was the victim's uncle. In August 1994 defendant and his girlfriend, Melanie Anderson, visited Tabitha's parents in Pennsylvania. With the consent of Tabitha's parents, defendant and Anderson took Tabitha to North Carolina for a short stay. Three or four weeks after taking custody of Tabitha, defendant and Anderson brought Tabitha to Wilkes Regional Medical Center. Tabitha was unconscious; and her body was covered with bruises, grab marks, pinch marks, scratches, nicks, bumps, and other injuries. The severe nature of her injuries necessitated transferring Tabitha to Baptist Hospital in Winston-Salem. On 25 August life support was withdrawn, and Tabitha died.

Defendant initially explained Tabitha's injuries by stating that a dog had knocked her down, that children in the neighborhood had assaulted her, and that she bruised easily. Defendant also stated that he had found Tabitha in the yard and that he had spanked and shaken her in an attempt to revive her. In subsequent statements to law

enforcement officers, defendant described various methods that he and Anderson had used to punish Tabitha during the short time that she had been in their care. Both Anderson and defendant had punished Tabitha for wetting her pants, wetting her bed, and refusing to eat. Anderson had punished Tabitha by making her hang from a dresser by her forearms and chin and by making her wear soiled pants on her head. Defendant had punished Tabitha by making her stand close to a wall, place her head on the wall, and hold her leg out in the air for two or three minutes with soiled pants on her head. Defendant admitted "smacking" Tabitha approximately ten times in the three weeks prior to her death. Defendant also admitted striking Tabitha with a belt, stating that this was normal punishment when she wet her pants or refused to eat.

Defendant stated that he heard Anderson striking Tabitha at approximately 8:00 p.m. on 24 August. Forty-five minutes later, while he was taking a shower, defendant heard Anderson bring Tabitha into the bathroom and chastise her for saying that she had to urinate when she did not. Defendant said that he saw Anderson strike Tabitha in the side of the head while Anderson asked, "What are you, dumb? Are you stupid. Can you not understand what I'm saying?" Anderson then put her hands on Tabitha's shoulder and began to shake her. Defendant then approached Tabitha, slapped her, and shook her hard for approximately one minute. The child went "limp" as he was shaking her. After Tabitha went "limp" defendant and Anderson took Tabitha to the hospital.

The State's evidence tended to show that bruises, grab marks, pinch marks, scratches, nicks, bumps, and other injuries covered Tabitha's body. She had severe head injuries; a torn frenulum, the piece of tissue between the upper lip and the teeth; bruises on the inside of her lips and around the gum line; a human bite mark on her thigh; and many other injuries. Tabitha's death was caused by severe injuries to her brain. Dr. Patrick Lantz, the State's pathologist, and Dr. Sara Sinal, a child-abuse expert and one of the doctors who treated Tabitha at Baptist Hospital, testified that all of Tabitha's injuries had been inflicted during the four-week period that she had been entrusted to the care of defendant and his girlfriend. Her injuries were not caused by the family dog, were not the result of normal childhood activity, and were not accidental. Dr. Lantz and Dr. Sinal opined that Tabitha was a victim of both the battered-child syndrome and the shaken-baby syndrome.

Additional facts will be presented as needed to discuss specific issues.

**[1]** In his first assignment of error, defendant contends that the trial court erred by denying his motions for funds to retain expert witnesses.

> An indigent defendant is entitled to the assistance of an expert in preparation of his defense when he makes a "particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case." *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992). "The particularized showing demanded by our cases is a flexible one and must be determined on a case-by-case basis." *Id.* at 656-57, 417 S.E.2d at 471. "The determination of whether a defendant has made an adequate showing of particularized need lies within the trial court's discretion." *State v. Rose*, 339 N.C. 172, 187, 451 S.E.2d 211, 219 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

*State v. McCullers*, 341 N.C. 19, 34, 460 S.E.2d 163, 172 (1995).

Defendant first contends that the trial court erred by denying his motion for funds to retain a psychiatrist. Prior to trial defendant filed a motion requesting commitment to Dorothea Dix Hospital for a determination on his competency to proceed, filed a notice of his intention to raise an insanity defense, and filed a request to hire a psychiatrist to assist him in the preparation of his defense. Dr. Nicole F. Wolfe subsequently examined defendant at Dorothea Dix and found him competent to proceed. In her report Dr. Wolfe stated that defendant suffered from polysubstance dependence and an unspecified personality disorder. On the basis of Dr. Wolfe's report, defendant asserted that his personality disorder diagnosis entitled him to funds for an independent psychiatrist.

An indigent defendant is entitled to the assistance of a psychiatric expert if the defendant makes a "threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Ake v. Oklahoma*, 470 U.S. 68, 82-83, 84 L. Ed. 2d 53, 66 (1985). In determining whether an indigent defendant has made this threshold showing, "the trial court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made." *State v. Gambrell*, 318 N.C. 249, 256, 347 S.E.2d 390, 394

STATE v. PIERCE

[346 N.C. 471 (1997)]

(1986). At an *ex parte* hearing on defendant's motion, defendant testified that he was twenty-two years old, that he had been placed in a program for the socially and emotionally disturbed in the seventh grade and remained in this program until the tenth grade, that he saw a psychiatrist during those years, that he had "trouble with juvenile court" which involved "[a] lot of assaults and drinking [and] drugs," that his psychologist had told him that he had an anger control problem, and that he had been placed in a juvenile facility where he had been required to see a psychologist. Defendant also introduced Dr. Wolfe's report into evidence. Dr. Wolfe diagnosed defendant as suffering from polysubstance dependence and a personality disorder. In her report Dr. Wolfe stated that defendant did not suffer from "a severe mental disease or defect which would prevent [defendant] from understanding the difference between right and wrong at the time of the alleged offense." Dr. Wolfe found that defendant was cooperative, that his thought processes were logical, that he did not appear to be delusional, and that his intellectual functioning appeared to be "fair to impaired." Defendant reported occasional hallucinations and suicidal thoughts during his stay at the hospital. Dr. Wolfe stated in her report that defendant was on psychotropic medications and recommended that defendant should continue to receive these medications while awaiting trial. At the conclusion of the *ex parte* hearing, the trial court found that defendant had not shown that his sanity was likely to be a significant factor in his defense and that fundamental fairness did not require the appropriation of funds for a private psychiatrist or psychologist.

The evidence presented by defendant in this case is similar to the evidence presented by the defendants in *State v. Hood*, 332 N.C. 611, 422 S.E.2d 679 (1992), *cert. denied*, 507 U.S. 1055, 123 L. Ed. 2d 659 (1993), and *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990). In *Hood* the psychiatrist who examined the defendant at Dorothea Dix Hospital diagnosed the defendant as suffering from a personality disorder. *Hood*, 332 N.C. at 619-20, 422 S.E.2d at 683-84. The psychiatrist found that the defendant's intelligence level was low-average; that the defendant's thought processes were slow, that the defendant's concentration, orientation, and memory functions were normal; and that the defendant's judgment and insight were fair. *Id*. Information in the psychiatrist's report indicated that the defendant denied any mental impairment at the time the alleged events occurred. *Id*. While the psychiatrist stated that he could not accurately determine the defendant's mental state at the time of the offense, he found that "available

information" included " 'no evidence of confusion or impairment at the time of the incident in question.' " *Id.* at 620, 422 S.E.2d at 684. After thoroughly reviewing this evidence, the Court held in *Hood* that the trial court properly denied the defendant's request for the appointment of a psychiatric expert. *Id.*

In *Robinson*, the defendant's evidence consisted of the report filed with the trial court by the psychiatrist who had evaluated the defendant's capacity to stand trial. *Robinson*, 327 N.C. at 353, 395 S.E.2d at 406. The psychiatrist diagnosed the defendant as having an alcohol abuse problem and a personality disorder. *Id.* at 352, 395 S.E.2d at 405. In the report the psychiatrist observed that the defendant had a cooperative attitude, clear speech, and coherent and organized thought processes. *Id.* at 351, 395 S.E.2d at 405. The psychiatrist found "no 'evidence of mental illness that could have impaired [the defendant's] ability to recognize right from wrong' at the time the crimes were committed" and "expressed an opinion that defendant presented 'no evidence of psychosis or other severe mental illness.' " *Id.* at 352, 395 S.E.2d at 405. This Court held that the trial court did not err by denying the defendant's motion for the appointment of a psychiatric expert. *Id.* at 355, 395 S.E.2d at 407.

Like the reports introduced into evidence by the defendants in *Hood* and *Robinson*, the report introduced by defendant in the present case not only fails to show that defendant's sanity at the time of the offense would be a factor at trial but also provides affirmative evidence that defendant's mental state at the time of the offense would not be a factor. *See Hood*, 332 N.C. at 620, 422 S.E.2d at 684; *Robinson*, 327 N.C. at 353, 395 S.E.2d at 406. Furthermore, defendant's testimony at the *ex parte* hearing did not show that his sanity at the time of the offense would be a factor at trial.

This case is easily distinguishable from *Ake*, 470 U.S. 68, 84 L. Ed. 2d 53, and *Gambrell*, 318 N.C. 249, 347 S.E.2d 390. In *Ake* the defendant's sole defense was insanity; the defendant's behavior at arraignment prompted the trial court, *sua sponte*, to have him examined by a psychiatrist; a psychiatrist subsequently found the defendant not competent to stand trial; when defendant was found competent to stand trial six weeks later, it was on the condition that he be sedated with large doses of Thorazine, an antipsychotic drug; and psychiatrists described to the trial court the severity of the defendant's mental illness less than six months after the offense. *Ake*, 470 U.S. at 86, 84 L. Ed. 2d at 68. This Court in *Gambrell* noted that

the evidence before the trial court tended to show that physicians two months after the shooting determined that the defendant needed psychiatric examination and treatment; that the defendant's behavior in open court was bizarre; that the defendant was ordered to undergo a psychiatric examination after the court observed this behavior; that on admission to the hospital the defendant was experiencing hallucinations and delusions, was suffering from depression and anxiety, and was thought to have an acute psychosis; and that the defendant was found competent to stand trial only after being administered the psychotropic drug Haldol in the highest recommended daily dosage. *Gambrell*, 318 N.C. at 257-58, 347 S.E.2d at 395. We conclude that the evidence presented by defendant does not approach the showing found sufficient by the Supreme Court of the United States in *Ake* or by this Court in *Gambrell*.

[2] Defendant next contends that the trial court erred by denying his motion for funds to retain a pathologist. In making this motion defense counsel stated that the independent pathologist would review the report of the State's pathologist and inform defense counsel of any possible defenses. Defendant argues that a pathologist could have assisted defendant in determining how Tabitha's injuries were inflicted. The " '[m]ere hope or suspicion' of the availability of certain evidence that might erode the State's case or buttress a defense will not suffice to satisfy the requirement that defendant demonstrate a threshold showing of specific necessity for expert assistance." *State v. Tucker*, 329 N.C. 709, 719-20, 407 S.E.2d 805, 811-12 (1991) (quoting *State v. Tatum*, 291 N.C. 73, 82, 229 S.E.2d 562, 568 (1976)). "Similarly, undeveloped assertions that the requested expert assistance would be beneficial or even essential to the preparing of an adequate defense are insufficient to satisfy this threshold requirement." *State v. Moseley*, 338 N.C. 1, 20-21, 449 S.E.2d 412, 425 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). Both Dr. Lantz and Dr. Sinal testified that Tabitha was a victim of the battered-child syndrome and the shaken-baby syndrome. All the evidence at trial suggested that Tabitha's death was caused by the injuries to her brain and that these injuries were incurred as a result of child abuse. Defendant's pretrial statements that Tabitha had been attacked by the family dog and assaulted by other children in the neighborhood and that she bruised easily were overwhelmingly refuted by the evidence presented by the State. We conclude that defendant presented the court with nothing more than an undeveloped assertion that the assistance of a pathologist would be beneficial to the preparation of

STATE v. PIERCE

[346 N.C. 471 (1997)]

his defense and that the trial court did not abuse its discretion by denying defendant's motion for funds to retain a pathologist.

[3] Defendant next contends that the trial court erred by denying his motion for funds to retain a medical expert in child abuse. At the pretrial hearing on this motion, defense counsel stated that this expert could "enlighten the defense more and testify at trial [] as to whom the possible perpetrators of [the child abuse] are if it's found that there is battered child syndrome present in this case." Defendant argues that experts could disagree as to whether Tabitha died as a result of battered-child syndrome or shaken-baby syndrome and that an expert could have determined whether Tabitha had been subjected to extensive child abuse.

The evidence at trial tended to show that defendant and Anderson had custody of Tabitha in the weeks prior to her death. Another adult, Roger Delp, lived with defendant and Anderson at that time. Defendant did not need the assistance of an expert to narrow down the list of possible perpetrators. Further, as discussed previously, all the evidence suggested that Tabitha's injuries had been incurred as a result of child abuse, and defendant did not present the trial court with anything other than speculation suggesting that an expert witness might testify that Tabitha had not been a victim of child abuse. On the facts of this case, we conclude the trial court did not abuse its discretion by determining that defendant failed to make a particularized showing that he would be deprived of a fair trial without the assistance of a medical expert in child abuse.

This assignment of error is overruled.

[4] By his next assignment of error, defendant contends that the trial court erroneously denied his motion to suppress his statement to SBI Agent Michael Brown.

Defendant made two statements to law enforcement officers prior to speaking with Agent Brown. Late in the evening of 24 August, defendant spoke with Detective David Pendry of the Wilkes County Sheriff's Department. This interview began some time after 11:00 p.m. at Wilkes Regional Medical Center. Pendry advised defendant of his *Miranda* rights at the hospital, and defendant acknowledged and waived his rights at that time. At approximately 3:30 a.m. defendant accompanied Pendry to the Sheriff's Department, where Pendry continued to speak with defendant until approximately 6:00 a.m. At 6:05 a.m. SBI Agent Pamela Tully introduced herself to defendant. Tully

advised defendant of his constitutional rights; and defendant signed a form stating that he understood his rights, that he did not want a lawyer, that no promises or threats had been made to him, and that he had not been coerced. Tully's interview lasted until approximately 9:45 a.m.

Agent Brown's interview with defendant began at 11:17 a.m. and lasted until 12:45 p.m. Brown did not readvise defendant of his rights before taking defendant's statement. Defendant contends that, under the totality of the circumstances, Agent Brown was required to readvise defendant of his *Miranda* rights.

"The consensus is that although *Miranda* warnings, once given, are not to be accorded 'unlimited efficacy or perpetuity,' where no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required."

*State v. Harris*, 338 N.C. 129, 140, 449 S.E.2d 371, 375 (1994) (quoting *State v. McZorn*, 288 N.C. 417, 433, 219 S.E.2d 201, 212 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). "The ultimate question is whether the defendant, with full knowledge of his legal rights, knowingly and intentionally relinquished them." *Id.* In *Harris* the defendant had been properly advised of his *Miranda* rights twelve hours before making the statement which he sought to have suppressed. In that case we concluded that it had not been necessary to readvise the defendant of his rights and rejected the defendant's assignment of error. We reach the same conclusion here.

The trial court found that defendant had been properly advised of his rights and that he waived those rights before speaking with Detective Pendry and Agent Tully. The court found that defendant's waiver was knowing, intelligent, and voluntary and that defendant was in control of his faculties and not under the influence of any substance at all relevant times. The record provides ample support for the trial court's findings. Pendry and Tully fully and properly advised defendant of his rights, and defendant waived his rights before giving statements to them. Tully advised defendant of his rights five hours before Brown took defendant's statement. Pendry, Tully, and Brown all interviewed defendant with respect to the same subject matter. All

three testified that defendant understood what they were saying to him, that defendant appeared to be alert, and that defendant did not appear to be under the influence of any substance. Nothing in the record suggests that anything occurred between the second and third statements to dilute the efficacy of the prior warnings or that defendant forgot his rights during this short time period. We conclude that the trial court did not err by denying defendant's motion to suppress the statement at issue. This assignment of error is overruled.

[5] By his next assignment of error, defendant contends that the trial court erred by overruling his objections to the introduction of twenty-six photographs of the victim's body.

Whether to admit photographic evidence requires the trial court to weigh the probative value of the photographs against the danger of unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403 (1992); *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was "so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. at 285, 372 S.E.2d at 526-27.

*State v. Gregory*, 340 N.C. 365, 387, 459 S.E.2d 638, 650 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996).

" 'Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Watson*, 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984) (quoting *State v. Cutshall*, 278 N.C. 334, 347, 180 S.E.2d 745, 753 (1971)). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526.

Over defendant's objection the State introduced twenty-six photographs of the victim's body to illustrate the testimony describing Tabitha's injuries. This testimony established that Tabitha had been severely beaten and that she had bruises, grab marks, pinch marks, scratches, nicks, bumps, and other injuries on almost every inch of her body. The State's witnesses described distinct injuries to Tabitha's head, her shoulders, her chin, her mouth, her legs, her back,

STATE v. PIERCE

[346 N.C. 471 (1997)]

her torso, and other portions of her body. Some of the injuries to Tabitha's body were linked to items seized in defendant's residence. Each of the photographs illustrated testimony presented by the State, and the testimony relating to Tabitha's injuries was unquestionably relevant. Given the number, nature, and extent of the victim's injuries, we conclude that the trial court did not abuse its discretion by admitting twenty-six photographs of the victim's body.

[6] In this assignment of error, defendant also contends that the trial court erred by admitting a photograph of defendant which was taken on the day of his arrest. Defendant argues that the photograph was not relevant and that any probative value was outweighed by the danger of unfair prejudice. At trial Agent Brown identified the photograph at issue and testified that it accurately represented defendant's appearance at the time of his arrest. The photograph which reveals that defendant has tattoos and that he had long hair at the time of his arrest is not inflammatory. Moreover, even assuming *arguendo* that the photograph should not have been admitted, we conclude that defendant has not shown that there is a reasonable possibility that, had the photograph been excluded, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). This assignment of error is overruled.

[7] Defendant next contends that the trial court erred by denying his motion for a mistrial after inadmissible evidence was inadvertently provided to the jury. Defendant's pretrial statement to Detective Pendry had been placed in the form of a writing by Pendry. After Pendry read this statement into evidence, the writing was admitted into evidence; and copies were provided to the jury. The copies provided to the jury contained a collateral notation made by Pendry. The notation, which was based on information obtained from a social worker, related the names and ages of Anderson's two children and contained the following assertion: "No bruises at all on [Anderson's] kids."

The prosecutor discovered the collateral notation after the writing had been published to the jury and immediately brought this fact to the attention of the court. The copies provided to the jury were retrieved, and the court conducted a *voir dire* which revealed that three jurors had seen the page containing the notation. Defendant moved for a mistrial. The trial court denied this motion and instructed the jurors to disregard the content of the page containing the notation.

**STATE v. PIERCE**

[346 N.C. 471 (1997)]

The decision whether to order a mistrial lies within the sound discretion of the trial court. *State v. King*, 343 N.C. 29, 44, 468 S.E.2d 232, 242 (1996).

> "When the trial court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured." *State v. Black*, 328 N.C. 191, 200, 400 S.E.2d 398, 404 (1991). " 'In appraising the effect of incompetent evidence once admitted and afterwards withdrawn, the Court will look to the nature of the evidence and its probable influence upon the minds of the jury in reaching a verdict.' " *State v. Hunt*, 287 N.C. 360, 374, 215 S.E.2d 40, 49 (1975) (quoting *State v. Strickland*, 229 N.C. 201, 207, 49 S.E.2d 469, 473 (1948)). "Whether instructions can cure the prejudicial effect of such statements must depend in large measure upon the nature of the evidence and the particular circumstances of the individual case." *Id.* at 375, 215 S.E.2d at 49.

*State v. Rowsey*, 343 N.C. 603, 627, 472 S.E.2d 903, 916 (1996), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 221 (1997).

Defendant argues that the collateral notation permitted the inference that Anderson did not abuse her children and that the notation, therefore, implied that defendant inflicted Tabitha's injuries. The evidence at trial tended to show that Anderson abused Tabitha and that Anderson struck and shook Tabitha on the night her fatal injuries were inflicted. For this reason any suggestion that Anderson did not abuse her children is unlikely to have prejudiced defendant in this trial. We conclude that the trial court's instruction was sufficient to cure any prejudice which defendant may have suffered and that the trial court did not abuse its discretion by declining to declare a mistrial. This assignment of error is overruled.

[8] By his next assignment of error, defendant contends that the trial court erred by admitting testimony concerning defendant's alleged mistreatment of one of Anderson's children. Over defendant's objection Debra Thompson testified that defendant on one occasion became angry with Anderson's four-year-old son, Roger. Thompson stated that defendant picked Roger up, shook him hard, and threw him down on a wooden chair with enough force to make the chair slide and hit the wall. This incident occurred six months before Tabitha's death. The trial court admitted this testimony pursuant to Rule 404(b) and gave the jury a limiting instruction pursuant to this rule. Defendant contends that this evidence was not admissible pursuant to Rule 404(b).

Rule 404(b) of the North Carolina Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1994).

This rule is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey,* 326 N.C. [268,] 278-79, 389 S.E.2d [48,] 54 [(1990)]. The list of permissible purposes for admission of "other crimes" evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime. *State v. Bagley,* 321 N.C. 201, 362 S.E.2d 244 (1987), *cert. denied,* 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

*State v. White,* 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 436 (1995).

In statements made after defendant took Tabitha to the hospital, defendant implied that he shook Tabitha in an attempt to revive her. The testimony that defendant shook and threw a four-year-old boy on a prior occasion is sufficiently similar to defendant's conduct in this case to contradict the suggestion that defendant inflicted Tabitha's injuries while attempting to revive her. Defendant's relatively recent treatment of Roger Anderson is thus relevant to establish defendant's motive and intent in shaking Tabitha and to show absence of mistake on defendant's part. *See State v. Crawford,* 329 N.C. 466, 486-87, 406 S.E.2d 579, 590-91 (1991). We hold that Thompson's testimony was relevant under Rule 404(b) for these purposes.

Defendant also argues that the trial court erred by failing to exclude this testimony under Rule 403. "Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy,* 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). The record shows that the court conducted a *voir dire* to consider Thompson's testimony and that the court excluded the evidence relating to defendant's treatment of Roger

Anderson until the State introduced the statement in which defendant admitted shaking Tabitha on the night she was taken to the hospital. The fact that the trial court conducted a *voir dire* suggests that it carefully weighed the probative value of the evidence against the danger of unfair prejudice to defendant. *See Crawford*, 329 N.C. at 486-87, 406 S.E.2d at 590-91. We also note that the trial court gave an appropriate limiting instruction. *See id.* On this record we conclude that the trial court did not abuse its discretion by refusing to exclude the testimony with respect to defendant's treatment of Anderson's four-year-old son.

Even if we assume *arguendo* that the testimony with respect to defendant's treatment of Roger Anderson was not admissible pursuant to Rule 404(b), we conclude that its admission did not prejudice defendant. The State presented overwhelming evidence that defendant and Melanie Anderson abused Tabitha over a three- or four-week period and that defendant and Anderson inflicted numerous injuries upon Tabitha during this period of time. Defendant told Agent Brown that he shook Tabitha very hard for approximately one minute on the night she was fatally injured and that Tabitha went "limp" while he was shaking her. We conclude that defendant has not shown that there is a reasonable possibility that, had the evidence at issue been excluded, a different result would have been reached at trial. *See* N.C.G.S. § 15A-1443(a).

This assignment of error is overruled.

[9] By his next assignment of error, defendant contends that the trial court erred by denying his motions to dismiss the charges at the close of all the evidence. Defendant refers this Court to other, unspecified, assignments of error and contends that, absent these errors, the evidence was insufficient to convict defendant of first-degree murder on the basis of torture, first-degree murder on the basis of felony murder, or felonious child abuse. After careful examination of each of the assignments relating to the admission of evidence, we have concluded that none amounted to prejudicial error. Moreover, in ruling on a motion to dismiss for insufficiency of the evidence, the trial court considers all the evidence, both competent and incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor. *McCullers*, 341 N.C. at 28-29, 460 S.E.2d at 168. Defendant does not argue that the evidence admitted at trial was insufficient to support the submission of the offenses of which he was found guilty. For

this reason this assignment of error is deemed abandoned. *See* N.C. R. App. P. 28(b)(5). We nevertheless review the evidence supporting defendant's convictions.

First-degree murder by torture requires the State to prove that the accused "intentionally tortured the victim and that such torture was a proximate cause of the victim's death." *State v. Stroud*, 345 N.C. 106, 112, 478 S.E.2d 476, 479 (1996); *accord Crawford*, 329 N.C. at 479-81, 406 S.E.2d at 586-88. We have approved an instruction defining "torture" as "the course of conduct by one or more persons which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure." *Crawford*, 329 N.C. at 484, 406 S.E.2d at 589; *accord State v. Anderson*, 346 N.C. 158, 161, 484 S.E.2d 543, 545 (1997). "Course of conduct" has been defined as "the pattern of the same or similar acts, repeated over a period of time, however short, which established that there existed in the mind of the defendant a plan, scheme, system or design to inflict cruel suffering upon another." *Crawford*, 329 N.C. at 484, 406 S.E.2d at 589; *accord Anderson*, 346 N.C. at 161, 484 S.E.2d at 545. A specific intent to kill is not an element of first-degree murder by torture. *Anderson*, 346 N.C. at 161, 484 S.E.2d at 545; *Crawford*, 329 N.C. at 480, 406 S.E.2d at 587.

When viewed in the light most favorable to the State, the evidence supported the submission of first-degree murder by torture. The evidence tended to show that defendant and Anderson punished Tabitha by shaking her with their hands and by beating her with their fists, with a belt, with a metal tray, with a broken antenna, and with a pair of tennis shoes. Anderson in defendant's presence punished Tabitha by making her hang from a dresser by her forearms and chin, and both Anderson and defendant punished Tabitha by making her wear soiled pants on her head. Defendant admitted "smacking" Tabitha ten times in the three weeks prior to her death, slapping Tabitha on the night she was taken to the hospital, and shaking her very hard on that night. The evidence at trial permitted the jury to conclude that defendant engaged in a course of conduct in which he intentionally inflicted grievous pain and suffering upon Tabitha, that he engaged in this conduct to punish Tabitha, and that the torture was a proximate cause of her death. Accordingly, the trial court properly denied defendant's motion to dismiss the charge of first-degree murder on the basis of torture.

**[10]** In order to sustain a conviction for felonious child abuse, the State must prove that "the accused is 'a parent or any other person

providing care to or supervision of a child less than 16 years of age' and that the accused intentionally inflicted a serious physical injury upon the child or intentionally committed an assault resulting in a serious physical injury to the child." *State v. Elliott,* 344 N.C. 242, 278, 475 S.E.2d 202, 218-19 (1996) (quoting N.C.G.S. § 14-318.4(a) (1993)), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 312 (1997). The State's evidence tended to show that defendant was Tabitha's uncle, that he and Anderson had custody of Tabitha for three or four weeks prior to her death, that Tabitha was two and one-half years of age at the time of her death, and that defendant intentionally committed an assault upon Tabitha resulting in her death. The trial court properly denied defendant's motion to dismiss this charge.

**[11]** "First-degree murder by reason of felony murder is committed when a victim is killed during the perpetration or attempted perpetration of certain enumerated felonies or a felony committed or attempted with the use of a deadly weapon." *State v. Gibbs,* 335 N.C. 1, 51, 436 S.E.2d 321, 350 (1993), *cert. denied,* 512 U.S. 1246, 129 L. Ed. 2d 881 (1994); *accord* N.C.G.S. § 14-17 (1993). Felony murder on the basis of felonious child abuse requires the State to prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon. *See* N.C.G.S. § 14-17. When a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons. *Cf. Elliott,* 344 N.C. at 268-69, 475 S.E.2d at 213 (stating that malice may be inferred from the willful blow by an adult on the head of an infant); *State v. Lang,* 309 N.C. 512, 527, 308 S.E.2d 317, 325 (1983) (stating that the trial court could have instructed the jury that it could infer malice if it found "that the defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons*"). Defendant is an adult male who weighed approximately 150 pounds at the time of his arrest. The evidence that he caused a small child's death by shaking her with his hands was sufficient to permit the jury to conclude that defendant committed felonious child abuse and that he used his hands as deadly weapons. Thus, the trial court did not err by refusing to grant defendant's motion to dismiss the charge of first-degree murder under the felony murder rule.

This assignment of error is overruled.

**[12]** By his next assignment of error defendant contends that the trial court's acting-in-concert instructions with respect to the offenses of first-degree murder by torture, first-degree murder under

the felony murder rule, and felonious child abuse constituted plain error. Defendant argues that the trial court erred by inserting the phrase "acting in concert" after defendant's name in its instructions on acting in concert. He argues that this permitted the jury to convict him without determining that he possessed the requisite specific intent to commit these offenses.

The State argues that murder by torture, felonious child abuse, and felony murder on the basis of felonious child abuse are general-intent crimes. Specific-intent crimes are "crimes which have as an essential element a specific intent that a result be reached." *State v. Jones,* 339 N.C. 114, 148, 451 S.E.2d 826, 844 (1994), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). General-intent crimes are "crimes which only require the doing of some act." *Id.* Felonious child abuse requires the State to prove "that the accused intentionally inflicted a serious physical injury upon the child *or* intentionally committed an assault resulting in a serious physical injury to the child." *Elliott,* 344 N.C. at 278, 475 S.E.2d at 218-19 (emphasis added). The State is not required to prove that the defendant "specifically intend[ed] that the injury be serious." *State v. Campbell,* 316 N.C. 168, 172, 340 S.E.2d 474, 476 (1986). Felony murder on the basis of felonious child abuse requires the State to prove that the victim was killed during the perpetration or attempted perpetration of felonious child abuse with the use of a deadly weapon. *See* N.C.G.S. § 14-17. This crime does not require the State to prove any specific intent on the part of the accused.

First-degree murder by torture requires the State to prove that the accused "intentionally tortured the victim and that such torture was a proximate cause of the victim's death." *Stroud,* 345 N.C. at 112, 478 S.E.2d at 479; *accord Crawford,* 329 N.C. at 479-81, 406 S.E.2d at 586-88. A specific intent to kill is not an element of first-degree murder by torture. *Anderson,* 346 N.C. at 161, 484 S.E.2d at 545; *Crawford,* 329 N.C. at 480, 406 S.E.2d at 587. In order to find a defendant guilty of this offense, the jury is required to find "the intentional infliction of grievous pain and cruel suffering resulting in death." *Crawford,* 329 N.C. at 485, 406 S.E.2d at 589. In *State v. Baldwin,* 330 N.C. 446, 412 S.E.2d 31 (1992), we stated:

[L]ying in wait is a physical act. Like poison, imprisonment, starving, and torture—the other physical acts specified in N.C.G.S. § 14-17—lying in wait is a method employed to kill. It does not require a finding of any specific intent.

*Baldwin,* 330 N.C. at 461-62, 412 S.E.2d at 40-41 (citations omitted); *accord State v. Aikens,* 342 N.C. 567, 575-76, 467 S.E.2d 99, 104-05 (1996).

Defendant argues that the court's instructions did not require the jury to find that defendant possessed the requisite specific intent to commit these crimes. Since none of these crimes requires specific intent, defendant's argument must fail. Moreover, defendant's argument is without merit under the statement of the doctrine of acting in concert adopted by this Court in *State v. Barnes,* 345 N.C. 184, 481 S.E.2d 44 (1997), in which a majority of this Court overruled *State v. Blankenship,* 337 N.C. 543, 447 S.E.2d 727 (1994), relied upon by defendant.

Defendant also contends that the trial court erred in reinstructing the jury on the doctrine of acting in concert with respect to the offenses of first-degree murder by torture, first-degree murder under the felony murder rule, and felonious child abuse. We have carefully reviewed these instructions. They are consistent with the court's initial instructions and are similarly without error.

[13] In a related assignment of error, defendant contends that the trial court erred by instructing the jury that it could find defendant guilty of first-degree murder and felonious child abuse under the doctrine of acting in concert. Defendant argues that the evidence was not sufficient to support a finding that he was guilty of these offenses on the basis of acting in concert. When viewed in the light most favorable to the State, the evidence tended to show that defendant and Anderson physically abused Tabitha for three weeks prior to her death. She had been beaten with a belt, a broken antenna, a metal tray, a pair of tennis shoes, and fists. Anderson in defendant's presence punished Tabitha by making her hang by her forearms and chin from a dresser, and both Anderson and defendant punished Tabitha by making her wear soiled pants on her head. Both defendant and Anderson struck and shook the child on the night that they took Tabitha to the hospital. This evidence tended to show that defendant and Anderson acted together with the joint purpose to commit murder by torture. The evidence was more than ample to show that defendant and Anderson acted together with the joint purpose to commit acts constituting felonious child abuse and torture and that Tabitha's death was a natural and probable consequence of their actions. Under the circumstances the trial court did not err by giving acting-in-concert instructions with respect to first-degree murder by

torture, first-degree murder under the felony murder rule, and felonious child abuse. This assignment of error is overruled.

[14] By his next assignment of error, defendant contends that the trial court erred by failing to intervene *ex mero motu* in arguments made by the prosecutor during his guilt-innocence phase closing argument.

"A prosecutor in a capital trial is entitled to argue all the facts submitted into evidence as well as any reasonable inferences therefrom." *Gregory*, 340 N.C. at 424, 459 S.E.2d at 672. As defendant failed to object at trial to any of the arguments at issue, "they are reviewable only to determine whether they were so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct the errors." *Id.*

Defendant contends that three arguments were grossly improper. In the first the prosecutor showed the jury a pair of tennis shoes that had been removed from the defendant's house and told the jury that "[a]t some point along the way, [the victim] was either hit or kicked with a shoe. We can't say it's these shoes, but these were the only ones that couldn't be eliminated." Defendant contends that this argument is a clear misstatement of the record. The record shows that the tennis shoes had been seized at defendant's residence and examined by the State's pathologist, Dr. Lantz. Prior to trial Dr. Lantz compared a pattern bruise on the victim's back with the "zig-zag like pattern on the soles" of these shoes, and he testified that the pattern bruise was consistent with the pattern on the soles of the shoes. When asked whether he could say that a shoe caused the injury, Dr. Lantz stated that the pattern on the victim's back appeared to be caused by some type of shoe or flat object, but that he could not "say definitely [that] it was actually a shoe that caused" the bruise. Referring to the shoes seized at defendant's residence, the pathologist told the jury that he could not "say with any degree of certainty that these shoes actually caused any injuries to [the victim's] body." After reviewing the testimony of the pathologist, we conclude that the prosecutor's comments were a reasonable inference from the facts in evidence. The trial court did not abuse its discretion by failing to intervene *ex mero motu.*

[15] Next, defendant contends that the prosecutor misstated the testimony by making the following argument: "[The victim] was shaken and she was thrown (Illustrating) and the back of her head, what Dr. Lantz told you, hit that wall. He's done it before. He did it with 'Tunny'

[Anderson's four-year-old son, Roger] so hard that the wooden chair fell up against the wall." The record shows that Dr. Lantz testified that a crack in the drywall at defendant's home was similar in appearance to an abrasion or scrape on the back of the victim's head. The State's evidence tended to show that Tabitha suffered severe injuries to the head and that the cause of death was brain injuries. This evidence supports the inference that defendant threw Tabitha and that the back of her head hit the wall. We conclude that the trial court did not abuse its discretion by failing to intervene *ex mero motu.*

[16] Finally, defendant contends that the prosecutor misstated the facts by telling the jury that defendant said he "smacked [the victim] ten times on the night of her death." Agent Brown testified that defendant told Brown that defendant smacked the victim ten times during the three-week period prior to Tabitha's death. We conclude that the prosecutor's misstatement was a *lapsus linguae;* that the trial court did not abuse its discretion by failing to intervene *ex mero motu* in the argument to correct the misstatement; and that there is no reasonable possibility that, had the court taken corrective action, a different result would have been reached at trial.

This assignment of error is overruled.

We conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.