STATE OF NORTH CAROLINA v. CHAD JARRETT BARROW

No. COA10-978

(Filed 1 November 2011)

### 1. Evidence—time of fatal injuries—harmless error

The trial court's admission of a doctor's testimony that the minor child victim's fatal injuries were inflicted between 8:00 am and 1:00 pm in a felony murder case was harmless error. Defendant failed to demonstrate there was a reasonable possibility that a different result would have been reached at trial absent the alleged error.

### 2. Homicide—felony. murder—submission of lesser-included offense of second-degree murder—child died by violent shaking or blow to head

The trial court did not err by submitting a second-degree murder instruction to the jury in a felony murder case. A defendant can be convicted of second-degree murder when a child dies as a result of violent shaking and/or a blow to the head inflicted by defendant.

### 3. Sentencing—aggravating factors—victim very young and physically infirm—took advantage of position of trust

The trial court erred in a felony murder case by failing to instruct the jury as provided in N.C.G.S. § 15A-1340.16(d) that evi-

dence necessary to prove an element of the offense shall not be used to prove any factor in aggravation. The State's theory regarding malice was virtually identical to the rationale underlying submission of the aggravating factor that the victim was very young and physically infirm. However, the trial court did not err with respect to the second aggravating factor that defendant took advantage of a position of trust in committing the offense. The case was reversed and remanded for further sentencing proceedings to determine whether the second aggravating factor, standing alone, outweighed the mitigating factors and warranted an aggravated range sentence.

Judge ELMORE dissenting.

Appeal by defendant from judgment entered 7 December 2009 by Judge Nathaniel J. Poovey in Cleveland County Superior Court. Heard in the Court of Appeals 23 February 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General Melissa L. Trippe, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Daniel Shatz, for defendant-appellant.*

GEER, Judge.

Defendant Chad Jarrett Barrow appeals from his conviction of second degree murder of his son, Jace. The jury was instructed that it could find defendant guilty of felony murder, second degree murder, or involuntary manslaughter, or it could find defendant not guilty. On appeal, defendant primarily argues that the trial court erred in submitting second degree murder to the jury because, according to defendant, the record does not contain evidence that would allow the jury to find him guilty of second degree murder but not guilty of felony murder. In order, however, for defendant to be guilty of felony murder (based on felonious child abuse), the jury was required to find that defendant used a deadly weapon. Since the State's evidence would have permitted the jury to find that defendant did not use a deadly weapon but still killed Jace with malice, we hold that the trial court properly instructed the jury on the offense of second degree murder.

Facts

The State's evidence tended to show the following facts. Jace Barrow was born on 5 March 2007 to Lindsey Kiser and defendant,

who lived together in Shelby, North Carolina. According to Jace's pediatric nurse practitioner, Jace was a healthy child and was growing and developing normally.

On 4 July 2007, Ms. Kiser, defendant, and Jace went to Ms. Kiser's family's lake house to spend the holiday with extended family. While it was defendant's turn to watch Jace, defendant became agitated and angry. Later, when defendant went to put Jace down for a nap, Ms. Kiser's cousin, Angela Alexander, went into the house and heard Jace screaming and crying. She saw defendant holding Jace and shaking him vigorously. Ms. Alexander took Jace and calmed him down. Ms. Kiser, who had also heard Jace crying, ran into the room. Defendant told her that when Jace woke up, he was crying, and defendant could not get the baby to calm down or take his bottle. Defendant was very agitated.

During a visit between defendant and Ms. Kiser's uncle, Keith Blanton, defendant said that caring for Jace was hard and if he could go back and do it over, he would never have had the baby. Defendant told Mr. Blanton, "We're not ready for it, unprepared for a baby." Mr. Blanton observed a change in defendant after Jace was born. While, before, defendant had seemed very happy, afterwards, he was very unhappy and agitated.

On 21 August 2007, defendant brought Jace to the house of Ms. Kiser's aunt, Kay Wallace. Defendant was helping Ms. Wallace's husband fix an attic fan. Ms. Wallace babysat Jace and took photographs of him. The photographs did not show any bruising on Jace's face. Towards the end of the day, Ms. Kiser's best friend, Ashley Pruitt, dropped by defendant and Ms. Kiser's house to visit, arriving before Ms. Kiser had gotten home from work. Immediately after Ms. Pruitt got there, defendant told her to "look what Jace did to his eye. He must have hit himself with a toy." Jace had bruises on his eye and nose and seemed lethargic and fussy.

On 22 August 2007, when Ms. Kiser went to work, she left Jace in defendant's care. Jace was happy, responsive, and in his swing as she left the house. Later that day, Officer Julius Littlejohn of the Shelby Police Department responded to a 911 call about an infant who was unable to breathe. When he arrived at defendant's home, he found defendant holding Jace, asking where EMS was. Officer Littlejohn described defendant as agitated and upset, and Officer Littlejohn took Jace from defendant. Initially, Jace's breathing was very weak, and then his breathing seemed to stop. Officer Littlejohn observed a

bruise under Jace's left eye and possibly bruises on Jace's nose and forehead. The officer performed rescue breathing until EMS arrived.

Paramedic Kenneth Dale Childers arrived at defendant's house at 12:21 p.m. He observed that Jace was cyanotic and only breathing two or three times per minute, which is not enough to sustain life—infants typically breathe 30 to 40 times per minute. Mr. Childers moved Jace into the ambulance and began giving him artificial respiration. Mr. Childers observed that Jace had a bruise over his left eye and across the bridge of his nose as well as an abrasion on the left side of his head above the ear with some swelling. Mr. Childers also observed that Jace had decerebrate posture, meaning that his extremities were posturing inward towards his body and his muscles were tight and flexed. Mr. Childers testified at trial that decerebrate posturing is usually a sign of a head injury.

Defendant told Mr. Childers that he found Jace slumped over in the swing when defendant got up from a nap. Later, Officer Barbie Ledford arrived to assist. She observed bruising around Jace's eye, across the bridge of his nose, on the left side of his forehead, by his ear, on the left side of his neck, and on the side of his rib cage. She asked defendant what had happened. Defendant told her that he had placed Jace in the swing, had turned on cartoons, and had then gone outside to smoke a cigarette. Defendant said that when he came back inside, Jace was slumped over and not breathing. Defendant could not explain the bruising, but said he thought it was from Jace sleeping on his hand.

In the emergency room, Dr. Joseph Mullen ordered a CT scan after observing the bruises on Jace's face. The CT scan showed intracranial bleeding, and Dr. Mullen had Jace transferred by helicopter to Carolinas Medical Center in Charlotte. Defendant told Dr. Mullen that he found Jace slumped over after he returned from smoking a cigarette outside.

Dr. Michael Brian Wilson treated Jace at the pediatric critical care unit of Levine Children's Hospital in Charlotte. At that point, Jace was not making any purposeful movements, and another CT scan showed signs of brain swelling. Despite efforts to relieve the pressure, Jace's condition continued to deteriorate. By the early morning of 23 August 2007, one of his pupils had become fixed and dilated, and another CT scan showed that Jace's brain had herniated, which Dr. Wilson described as "not an injury that you can recover from."

Dr. Wilson concluded that Jace's bilateral subdural bleeding and a retinal hemorrhage in Jace's right eye indicated he suffered significant trauma. According to Dr. Wilson, "[t]here has to be either a . . . blunt force injury[] or . . . an extremely forceful shaking injury to produce bleeding in the back of the eye." Dr. Wilson explained that because a five-month-old's brain and blood vessels are still forming, "[i]f a child is shaken forcefully, the brain slushes back and forth inside the head, and that can produce bleeding" by breaking the "blood vessels that come out of the brain and into the skull" and causing "bleeding at the back of the eye." Dr. Wilson believed that the bruises on Jace's face had occurred within 24 to 48 hours and that whatever trauma caused the bruising could also have caused the injury to Jace's brain.

Defendant was indicted for first degree murder of Jace. A separate indictment alleged two aggravating factors: that, at the time of the killing, (1) the victim was very young and physically infirm, and (2) defendant took advantage of a position of trust to commit the offense.

At trial, the State presented expert testimony that Jace suffered two acute subdural hematomas, cerebral edema, retinal hemorrhages, and bruises and abrasions on his head. Dr. Christopher Gulledge, of the Mecklenburg County Medical Examiner's office, found that the cause of Jace's death was abusive head trauma. He testified that the type of injuries suffered by Jace are immediately symptomatic and that, in his opinion, the injuries therefore happened between 8:00 a.m. and 1:00 p.m. on 22 August 2007.

Dr. Jeremy Jones, a neuroradiologist on staff at Carolinas Medical Center, testified regarding the CT scans taken during the course of Jace's treatment. He concluded that the CT scans were consistent with Jace's injuries having been inflicted between 8:00 a.m. and 12:00 p.m. on 22 August 2007.

Defendant presented expert testimony from an associate medical examiner from Florida; a neurosurgeon; the chief of neuropathology and surgical pathology and director of anatomic pathology services at Duke University Medical Center and School of Medicine; and a clinical neurosurgeon. Defendant's medical experts attributed Jace's injuries to a chronic subdural hematoma that had been present for at least a month and could have been present since birth. Defendant's expert witnesses believed that the chronic subdural hematoma had spontaneously re-bled, causing a seizure, which in turn led to hypoxia and severe brain damage. They also expressed the opinion that shak-

ing alone could not cause subdural hematomas or cerebral edema and that Jace's injuries were not caused by shaking.

Defendant also called Ms. Kiser to testify regarding an incident when Jace was two months old and had rolled off the couch onto a carpeted floor. In addition, however, Ms. Kiser testified that on the morning of 22 August 2007, Jace was very alert and trying to find his toys. Jace had no bruising or abrasions on his face other than the bruising around his eye from the day before. When she tried to wake defendant, he did not want to get up, but Ms. Kiser told him he had to get up to take care of the baby.

On rebuttal, the State presented evidence from a pediatrician with a specialty in child abuse and a pediatric ophthalmologist. The pediatrician testified that it is rare for babies five months old to develop bruises from their own motor actions since they lack the ability to exert enough force to cause bruising. She also testified that violent shaking of a baby causes tears between the top of the brain and the underside of the dura mater that can cause the baby to stop breathing, which leads to a cascade of effects, including a subdural hematoma. Both experts testified that they believed the retinal hemorrhaging in Jace's left eye was indicative of abusive head trauma. On surrebuttal, however, defendant presented testimony from the Forsyth County Medical Examiner that the findings of Jace's retinal hemorrhages could have been the result of a number of different causes and did not necessarily indicate head trauma.

After the close of evidence, the trial court instructed the jury on first degree murder under the felony murder rule with felony child abuse as the underlying felony, as well as second degree murder and involuntary manslaughter. The jury found defendant guilty of second degree murder.

The trial court then submitted to the jury the two aggravating factors of the victim's being young and physically infirm and defendant's taking advantage of a position of trust to commit the offense. The jury found both aggravating factors beyond a reasonable doubt. The trial court found as mitigating factors that defendant supports his family, has a support system in the community, and has a positive employment history or is gainfully employed. After finding that the aggravating factors outweighed the mitigating factors, the trial court sentenced defendant to an aggravated-range term of 196 to 245 months imprisonment. Defendant timely appealed to this Court.

I

**[1]** Defendant first argues that the trial court erred in admitting Dr. Gulledge's testimony that Jace's fatal injuries were inflicted between 8:00 a.m. and 1:00 p.m. Defendant contends that this testimony failed to meet the reliability standard set out in *State v. Ward*, 364 N.C. 133, 694 S.E.2d 738 (2010), and *Howerton v. Arai Helmet Ltd.*, 358 N.C. 440, 597 S.E.2d 674 (2004).

Even assuming, without deciding, that this testimony failed to meet the standards for reliability, defendant has failed to demonstrate that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C. Gen. Stat. § 15A-1443(a) (2009). While defendant contends that "Dr. Gulledge's opinion was the State's only evidence that the injuries occurred during this interval" after Ms. Kiser left for work on the morning of 22 August 2007, Dr. Jeremy Jones in fact gave testimony, without objection, that was almost identical to that of Dr. Gulledge.

Dr. Jones testified that the timeframe of 8:00 a.m. through 12:00 p.m. "would be consistent with what we see on the CT scans." He confirmed that his opinion regarding the time frame remained the same after reviewing the third CT taken at 3:35 p.m. on 22 August 2007. Given that this testimony is effectively the same as that of Dr. Gulledge and that defendant has made no objection that Dr. Jones' testimony was unreliable, we cannot conclude that there is a reasonable possibility that the jury would have acquitted defendant or convicted him of involuntary manslaughter had Dr. Gulledge's testimony been excluded. *See State v. Fullwood*, 323 N.C. 371, 384, 373 S.E.2d 518, 526-27 (1988) (holding that admission of expert testimony that defendant's wounds were self-inflicted was harmless error when two other doctors testified to essentially same opinions), *vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602, 110 S. Ct. 1464 (1990); *State v. Henderson*, 182 N.C. App. 406, 416, 642 S.E.2d 509, 515 (2007) (holding that admission of nurse's testimony was harmless error when it substantially reiterated another witness' expert testimony that was not challenged on appeal).

II

**[2]** Defendant next argues that the trial court erred in submitting an instruction to the jury on second degree murder. It is well established that "when the state proceeds on a theory of felony murder only, the trial court should not instruct on lesser-included offenses '[i]f the evi-

dence as to the underlying felony supporting felony murder is not in conflict and all the evidence supports felony murder.' " *State v. Gwynn,* 362 N.C. 334, 336, 661 S.E.2d 706, 707 (2008) (quoting *State v. Millsaps,* 356 N.C. 556, 565, 572 S.E.2d 767, 774 (2002)).

Defendant contends that the evidence supporting felonious child abuse—the underlying felony—was not in conflict and, therefore, the trial court was barred from instructing on second degree murder. According to defendant, in order to find defendant guilty of second degree murder, the jury would have to make the same factual findings that would dictate a verdict of guilty of felony murder. We disagree.

N.C. Gen. Stat. § 14-17 (2009) provides that a defendant can be convicted of felony murder if the murder was "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, *or other felony committed or attempted with the use of a deadly weapon . . . .*" (Emphasis added.) Because felonious child abuse is not specifically listed in N.C. Gen. Stat. § 14-17, in order to prove felony murder, the State, in this·case, was required to show that the child abuse was committed with the use of a deadly weapon. *See State v. Pierce,* 346 N.C. 471, 493, 488 S.E.2d 576, 589 (1997) ("Felony murder on the basis of felonious child abuse requires the State to prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon.").

In *Pierce,* the Supreme Court explained that "[w]hen a strong or mature person makes an attack by hands alone upon a small child, the jury *may infer* that the hands were used as deadly weapons." *Id.* (emphasis added). The Court concluded that "[t]he evidence that [the defendant] caused a small child's death by shaking her with his hands was sufficient to permit the jury to conclude that defendant committed felonious child abuse and that he used his hands as deadly weapons." *Id.* The Court, therefore, held that "the trial court did not err by refusing to grant defendant's motion to dismiss the charge of first-degree murder under the felony murder rule." *Id.*

Contrary to defendant's suggestion otherwise, *Pierce* does not *require* a jury to find that a defendant who shook a child was using his or her hands as deadly weapons. It simply held that the trial court properly instructed the jury that it could make that finding. This Court in *State v. Stokes,* 150 N.C. App. 211, 225, 565 S.E.2d 196, 205 (2002) (internal quotation marks omitted), *rev'd in part on other grounds,* 357 N.C. 220, 581 S.E.2d 51 (2003), upheld jury instructions

as being properly based on *Pierce* when they "made it clear to the jury that the jury was not compelled to infer anything, and that it was free to decide from all the evidence whether defendant's hands had been used as a deadly weapon."

Here, the trial court similarly instructed the jury that it could find—but was not required to find—that defendant used his hands as a deadly weapon. If the jury decided that defendant's hands were not a deadly weapon, it was required to find defendant not guilty of felony murder.

In that event, the trial court instructed, the jury was required to decide whether defendant was guilty of second degree murder, which the court explained required a finding of the following elements:

So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date Jace Barrow sustained a fatal injury and that this injury proximately caused the death [of] Jace Barrow and that this injury was inflicted intentionally and not by accident and that it was the defendant who intentionally inflicted this injury and that in so doing the defendant acted with malice, it would be your duty to return a verdict of guilty of second degree murder.

With respect to malice, the trial court explained: "To find that the defendant acted with malice, you need not find that he intended to kill Jace Barrow, but you must find beyond a reasonable doubt that his acts were so reckless or wantonly done as to indicate a total disregard of human life."

Our courts have already concluded that evidence of the type submitted by the State in this case is sufficient to support a conviction of second degree murder. *See State v. Smith*, 146 N.C. App. 1, 23, 551 S.E.2d 889, 902 (2001) (Tyson, J., dissenting) (holding that defendant could be convicted of second degree murder when child died as result of violent shaking and/or blow to head inflicted by defendant), *rev'd per curiam for reasons in dissenting opinion*, 355 N.C. 268, 559 S.E.2d 786 (2002); *State v. Qualls*, 130 N.C. App. 1, 10-11, 502 S.E.2d 31, 37 (1998) (holding that sufficient evidence of malice existed for second degree murder when defendant severely shook child, "an act which ultimately led to his death"), *aff'd*, 350 N.C. 56, 510 S.E.2d 376 (1999). *See also State v. Trogden*, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___, 2011 N.C. App. LEXIS 2048 (Sept. 20, 2011) (holding that sufficient evidence of malice was shown for purposes of second degree murder in child abuse case because attack of strong adult on young

child is reasonably likely to result in death or serious bodily injury to child).

Consequently, we hold that the jury in this case could rationally find defendant guilty of second degree murder and not guilty of first degree felony murder. The trial court, therefore, properly instructed the jury on the offense of second degree murder. *See Millsaps*, 356 N.C. at 561, 572 S.E.2d at 771.

III

**[3]** Finally, defendant contends that the trial court erred in failing to instruct the jury, as provided in N.C. Gen. Stat. § 15A-1340.16(d) (2009), that "[e]vidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation . . . ." Defendant argues that the jury "probably" relied on identical evidence to find both the elements of second degree murder and the aggravating factors that Jace was very young and physically infirm and that defendant took advantage of a position of trust to commit the offense.

The State argues that defendant did not object to the trial court's instruction and, therefore, did not preserve the issue for review. In *State v. Keel*, 333 N.C. 52, 56-57, 423 S.E.2d 458, 461 (1992), however, the Supreme Court held that when the trial court agreed to the State's request (concurred in by the defendant) that the court would give a particular pattern jury instruction but then changed a portion of the pattern instruction, the defendant could challenge the changed portion on appeal. The Court explained: "The State's request, approved by the defendant and agreed to by the trial court, satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." *Id.*

Here, the trial court advised the parties that it would give the pattern jury instructions applicable in bifurcated proceedings to determine aggravating factors, including N.C.P.I. 204.25, which begins by stating that "[e]vidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation[.]" The trial court omitted that portion of the pattern instruction although the remainder of the instruction was nearly identical to N.C.P.I. 294.25. Under *Keel*, the omission of this portion of the pattern instruction is properly before this Court.

The trial court has the burden of declaring and explaining the law arising on evidence as it relates to each substantial feature of the case. *State v. Moore*, 339 N.C. 456, 464, 451 S.E.2d 232, 236 (1994).

Because N.C. Gen. Stat. § 15A-1340.16(d) limits what evidence the jury can consider in deciding whether an aggravating factor exists, the trial court was required to instruct the jury in accordance with the statute—as the pattern jury instruction specifies.

However, "it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." *Robinson v. Seaboard Sys. R.R., Inc.*, 87 N.C. App. 512, 524, 361 S.E.2d 909, 917 (1987). Further, we must determine whether there is a reasonable possibility that had the instruction been given, the jury would have failed to find the existence of the aggravating factors. *See* N.C. Gen. Stat. § 15A-1443(a).

Nothing in the court's actual instructions to the jury would have indicated to the jury that it could not consider all of the evidence presented during the guilt-innocence phase when deliberating on the aggravating factors. Indeed, during the instructions for the aggravating factor phase, the trial court instructed the jury that "[a]ll of the evidence has been presented" and that it was the duty of the jury to decide "from this evidence what the facts" were regarding the aggravating factors. The court directed the jury to "remember all the evidence" and "consider all the evidence" in deciding whether the aggravating factors existed. Given these instructions, it is highly likely that the jury believed that it could consider all of the evidence in reaching a verdict on each aggravating factor.

With respect to the jury's finding of the aggravating factor that the victim was "very young and physically infirm[]," we believe that there is a reasonable possibility that the jury relied upon evidence that was also the basis for its verdict of second degree murder. The underlying purpose of this aggravating factor is "to deter wrongdoers from taking advantage of a victim because of his age or mental or physical infirmity." *State v. Deese*, 127 N.C. App. 536, 540, 491 S.E.2d 682, 685 (1997). Consequently, a victim's age can make " 'a defendant more blameworthy [when] the victim's age causes the victim to be more vulnerable than he or she otherwise would be to the crime committed against him or her, as where age impedes a victim from fleeing, fending off attack, recovering from its effects, or otherwise avoiding being victimized.' " *Id.* at 541, 491 S.E.2d at 686 (quoting *State v. Hines*, 314 N.C. 522, 525, 335 S.E.2d 6, 8 (1985)).

Here, the State's theory regarding second degree murder relied almost exclusively on the fact that because of the vulnerability of a

STATE v. BARROW

[216 N.C. App. 436 (2011)]

five-month old child, shaking him is such a reckless act as to indicate a total disregard of human life—the showing necessary for malice. *See State v. Wilkerson*, 295 N.C. 559, 581, 247 S.E.2d 905, 918 (1978) ("An act that indicates a total disregard for human life is sufficient to supply the malice necessary to support the crime of second degree murder."). Thus, the State's theory regarding malice is virtually identical to the rationale underlying submission of the aggravating factor that the victim was "very young and physically infirm[]."

There is, as a result, a reasonable possibility that the jury relied on Jace's age both in finding malice and in finding the aggravating factor, which would violate N.C. Gen. Stat. § 15A-1340.16(d). Further, had the jury been instructed in accordance with N.C. Gen. Stat. § 15A-1340.16(d), a reasonable possibility exists that the jury would have concluded that it could not find the aggravating factor without the evidence that formed the basis for the second degree murder verdict. *See State v. Corbett*, 154 N.C. App. 713, 717, 573 S.E.2d 210, 214 (2002) (holding that when defendant was charged with second degree sexual offense, trial court erred in finding aggravating factor that defendant abused position of trust because State's theory of the case relied upon finding of constructive force based upon parent-child relationship).

We reach a different conclusion, however, with respect to the aggravating factor that defendant took advantage of a position of trust in committing the offense. The State's theory of the case and the trial court's instructions during the guilt-innocence phase did not require that the jury consider, in convicting defendant of second degree murder, whether defendant took advantage of his status as a parent or his being entrusted with his own child's care. The focus with respect to second degree murder was on the actual physical acts that resulted in Jace's death. Defendant has not, therefore, demonstrated that a reasonable possibility exists that had the jury been properly instructed it would not have found the existence of the second aggravating factor.

Consequently, we hold that the trial court erred in failing to give the full pattern jury instruction. Defendant has shown prejudicial error with respect to the first aggravating factor, but not the second. Accordingly, we must reverse and remand for further sentencing proceedings. On remand, the trial court must determine whether the second aggravating factor, standing alone, outweighs the mitigating factors and warrants an aggravated-range sentence.

No error in part; reversed and remanded in part.

Judge BRYANT concurs.

Judge ELMORE dissents in a separate opinion.

ELMORE, Judge, dissenting.

Because I would vacate the judgment below and order a new trial for defendant, I respectfully dissent.

Defendant first argues that the trial court erred by instructing the jury on second-degree murder. I agree, because the evidence would not permit the jury to rationally find defendant guilty of second-degree murder and to acquit him of first-degree murder under the felony murder rule.

The trial court instructed the jury on first-degree murder under the felony murder rule, with felony child abuse as the underlying felony. The trial court also instructed the jury on second-degree murder and involuntary manslaughter as lesser-included offenses. During the charge conference, defense counsel objected to the second-degree murder instruction.

As our Supreme Court has explained, trial courts must not give a lesser-included offense instruction unless the instruction is supported by the evidence:

> Principles of due process "require[] that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611, 72 L. Ed. 2d 367, 373 (1982). Underlying this rule is the realization that instructing the jury on a lesser-included offense that is not supported by the evidence improperly invites a compromise verdict whereby the defendant would be found guilty of an offense, which he did not commit, for the sole reason that some of the jurors believe him guilty of the greater offense.

*State v. Worsley*, 336 N.C. 268, 276-77, 443 S.E.2d 68, 72 (1994) (additional quotations and citations omitted). "An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense *and to acquit him of the greater*." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) (citation omitted; emphasis added). In *Millsaps*, the Supreme Court set out the following "standard for deciding

whether the trial court must instruct on and submit second-degree murder as a lesser-included offense of first-degree murder":

> The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Id.* at 560, 572 S.E.2d at 771 (citation omitted).

The trial court summarized the first-degree murder instruction for the jury as follows:

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date, the defendant was the parent of Jace Barrow; that Jace Barrow had not yet reached his sixteenth birthday; and that the defendant intentionally inflicted a serious physical injury to the child or intentionally assaulted the child which proximately resulted in a serious physical injury to the child; and that while committing felonious child abuse the defendant killed Jace Barrow; and that the defendant's act was a proximate cause of Jace Barrow's death; and that the defendant committed felonious child abuse with the use of a deadly weapon, it would be your duty to return a verdict of guilty of first degree murder.

The trial court instructed the jury that, if it found that defendant had "made an attack by hands alone upon Jace Barrow," it could "infer that the hands were used as a deadly weapon."

The trial court summarized the second-degree murder instruction, which the jury was only to consider if it did not find all of the elements of first-degree murder, as follows:

> So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date Jace Barrow sustained a fatal injury and that this injury proximately caused the death [of] Jace Barrow and that this injury was inflicted intentionally and not by accident and that it was the *defendant who* intentionally inflicted this injury and that in so doing the defendant acted with malice, it would be your duty to return a verdict of guilty of second degree murder.

The trial court defined proximate cause as

> a real cause, a cause without which Jace Barrow's death would not have occurred. The defendant's act need not have been the only cause nor the last or nearest cause. It is sufficient if it occurred with some other cause acting at the time which in combination with it caused the death of Jace Barrow.

With respect to malice, the trial court explained that, "[t]o find that the defendant acted with malice, you need not find that he intended to kill Jace Barrow, but you must find beyond a reasonable doubt that his acts were so reckless or wantonly done as to indicate a total disregard of human life."

Defendant argues that the State's evidence pointed exclusively to first-degree murder, and his evidence pointed to his not being guilty of any offense; no evidence pointed to defendant being guilty of second-degree murder *but not guilty of first-degree murder.* In other words, finding defendant guilty of second-degree murder required the same factual findings as finding defendant guilty of first-degree murder with the exception of certain facts that were not at issue, such as whether defendant was Jace's father and whether Jace was under the age of sixteen. Thus, no jury could rationally find defendant guilty of second-degree murder but not guilty of first-degree murder. I agree with this reasoning.

To find defendant guilty of second-degree murder, the jury had to reach the following conclusions: (1) "Jace Barrow received a fatal injury"; (2) that "injury was a proximate cause of Jace Barrow's death"; (3) that the "injury was inflicted intentionally and not by accident or misadventure[,]" meaning that "the person who caused it intended to apply the force by which it was caused"; (4) that the person who inflicted this injury was defendant; and (5) that defendant acted with malice, meaning "his acts were so reckless or wantonly done as to indicate a total disregard of human life."

To find defendant guilty of first-degree murder, the jury had to reach the following conclusions: (1) defendant committed felonious child abuse; (2) while committing felonious child abuse, defendant killed Jace; (3) defendant's act was the proximate cause of Jace's death; and (4) the felonious child abuse was committed with the use of a deadly weapon. To conclude that defendant had committed felonious child abuse, the jury had to find that (1) defendant was Jace's parent; (2) at the time of the abuse, Jace was not yet sixteen years old; and (3) "defendant intentionally inflicted a serious physical

injury to the child or intentionally assaulted the child which proximately resulted in serious physical injury to the child," a serious physical injury being "such physical injury as causes great pain and suffering." The State's evidence suggested that if defendant hit or shook Jace, he did so using his hands. The State offered no evidence that defendant used any other weapon or that Jace sustained his injuries by any means other than defendant's hands.

A jury could not rationally conclude that defendant had committed second-degree murder while also concluding that defendant had not committed first-degree murder. The legal findings required for first-degree murder are identical to the findings required for second-degree murder, with the exception of Jace's parentage and age, which were not at issue. This is similar to felony murder cases involving a felonious assault on a single victim. *State v. Jones*, 353 N.C. 159, 170 n.3, 538 S.E.2d 917, 926 n.3 (2000).

> In such cases, the assault on the victim cannot be used as an underlying felony for purposes of the felony murder rule. Otherwise, virtually all felonious assaults on a single victim that result in his or her death would be first-degree murders via felony murder, thereby negating lesser homicide charges such as second-degree murder and manslaughter.

*Id.* Accordingly, I would hold that the trial court erred by instructing the jury on the lesser-included offense of second-degree murder.

I would also hold that the error was not harmless and, as a result, defendant is entitled to a new trial.

"[S]ome errors of this type are not prejudicial to the defendant because had the jury not had the option of convicting on the lesser offense, it would likely have convicted on the greater offense, subjecting the defendant to harsher penalties." *State v. Arnold*, 329 N.C. 128, 140, 404 S.E.2d 822, 829 (1991) (citation omitted). In *Arnold*, our Supreme Court explained that submitting a lesser-included offense for which there is insufficient evidence violates a defendant's federal due process rights, which we review under N.C. Gen. Stat. § 15A-1443(b). *Id.* Subsection 15A-1443(b) states, in relevant part, that

> [a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

N.C. Gen. Stat. § 15A-1443(b) (2009). "The State must therefore prove that the error was harmless beyond a reasonable doubt. Overwhelming evidence of defendant's guilt may render constitutional error harmless beyond a reasonable doubt." *Arnold*, 329 N.C. at 140, 404 S.E.2d at 829-30 (citation omitted).

Here, the evidence of defendant's guilt of first-degree murder was not overwhelming. Defendant's experts all opined that Jace died of natural causes and was not killed as a result of abusive head trauma. Even the State's experts agreed that Jace's brain injuries *could* have been caused by seizure-induced hypoxia rather than abusive head trauma. Finally, as the Supreme Court in *Arnold* stated,

> Our conclusion is further demonstrated by the fact that the jury found defendant guilty of murder in the second degree, a charge which was not supported by the evidence. This verdict was also tantamount to a verdict of not guilty as to the [first-degree murder] charge. Had not the inviting verdict of murder in the second degree been available to the jury, and its choice limited to guilty of murder in the first degree or not guilty, the verdict may well have been one of not guilty.

*Id.* at 141, 404 S.E.2d at 830. The State having failed to prove that the error was harmless beyond a reasonable doubt, I would hold that defendant was prejudiced by the trial court's error and reverse his conviction for murder in the second degree.

Accordingly, I believe that defendant is entitled to a new trial. I would add that, as in *Arnold*, "defendant may not now be retried for first degree murder. Conviction of second degree murder acts as acquittal of first degree murder, and thus retrial would place the defendant in double jeopardy in violation of h[is] rights under the Fifth and Fourteenth Amendments to the Federal Constitution." *State v. Arnold*, 98 N.C. App. 518, 533, 392 S.E.2d 140, 150 (1990), affirmed by 329 N.C. 128, 404 S.E.2d 822 (1991), (citing *Price v. Georgia*, 398 U.S. 323, 26 L. Ed. 2d 300 (1970); additional citations omitted).